(69 Misc. Rep. 510.)

WILLIS et al. v. CITY OF NEW YORK.

(Supreme Court, Special Term, New York County.   November, 1910.)

1. WATERS AND WATER COURSES (§ 107*)—PERCOLATING WATER—DIVERSION —INJUNCTION.

Where a city, to obtain a water supply, acquires lands and sinks wells, pumping up the water percolating below the surface, taking it from contiguous lands of other owners, such owners may recover for the injuries done them, and may have a continuance of the trespass enjoined.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. §§ 116, 117; Dec. Dig. § 107.*]

2. WATERS AND WATER COURSES (§ 107*)—PERCOLATING WATERS—DIVERSION —ACTION FOR DAMAGES—BURDEN CF PROOF.

In an action against a city for sinking wells, whereby plaintiff's water supply is destroyed, the burden is upon plaintiff to prove that his lands were so within the influence of the city's operations that water in his land was taken from it, or water which would naturally have come there was prevented from coming, and where it does not appear that the lowering of the ground water levels upon his property may not have been due to natural causes, and the distance of the city pumping stations makes it appear well-nigh impossible that plaintiff's property could have been injured by the city's operations, the burden of proof is not sustained.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. §§ 116, 117; Dec. Dig. § 107.*]

Action by Thomas Willis and another against the City of New York.   Complaint dismissed.

Epstein & Epstein (Jesse S. Epstein, of counsel), for plaintiffs.

Archibald R. Watson (Edward S. Malone, of counsel), for defendant.

McCALL, J.   The litigation presented to us for determination finds its origin in the efforts, originally made by the former city of Brooklyn, and continued by the greater city of New York, after amalgamation, to provide water for the uses and purposes of the inhabitants of what is now the borough of Brooklyn, in the enlarged city.   To the end of accomplishing that purpose, the officers of the municipal government planned to collect, house, or reservoir the waters percolating the earth within given, fixed, or definite areas in the territory known as Long Island, and their system contemplated the erection of reservoirs, pumping stations, driven wells, and infiltration plants that have been minutely defined and explained in the testimony offered in the case at bar.   Of course, the proof establishes the fact, and no dispute arises over the question, that the ultimate distribution of this water (so obtained and collected) to the inhabitants of the city, or a portion thereof, was not and is not gratuitously made, but is charged for by the municipal government on the basis of fixed and definite rates, determined by meters and assessment following the vogue governing such matters in all municipalities.   It has been demonstrated and proven in the case at bar that the defendant has constructed and maintained, and is now operat-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

ing and using, various plants on Long Island for the collecting, housing, and storing of some of its subsurface waters, and that it disposes of same for price fixed and charge made as referred to above. If it be further established that in the working of these various processes, to wit, pumping stations or infiltration galleries, they have wrought damage to another owner's land by taking it from such owner's land and contiguous territory and leading it to their own for the purposes of marketing it and preventing its return, then they become responsible for the harm they have done, in money damages, limited to six years prior to the beginning of the action against them, and the plaintiffs are entitled to invoke the aid of the equity side of the court by way of injunctive relief against a continuance of the trespass. Reisert v. City of N. Y., 101 App. Div. 93, 91 N. Y. Supp. 780; Id., 174 N. Y. 196, 66 N. E. 731.

It requires more proof in causes of this character, in my view of the situation, than the mere establishment of the fact that the city operates these plants and that there is a lowering or variation of the so-called "water table" of plaintiffs' premises, even if that fact be established, to find a warrant or a basis for judgment. With the principle of law announced in the Reisert and similar cases there can be no quarrel, but to mulct the defendant the facts must be proven to make that principle applicable. And has that been done? The plaintiffs are the owners of a tract or parcel of land, situate in Baldwin, in the county of Nassau, in this state, comprising about 50 acres. This land was purchased by them in 1896, and has been since that date in their possession. On the trial of the action, under the broad and general allegations of the complaint, it would have been exceedingly difficult to have circumscribed or to have limited the proof of the plaintiffs in reference to the number or location of the wells, stations, or plants that they asserted wrought the damage they complained of, and considerable latitude was allowed them in their proof, in the view that, after everything had been encompassed in the evidence as to location and operation of those various plants, and the further proof of expert engineers, and the experience of tests had been adduced, a truer basis could be reached for a proper, reasonable, and just conclusion as to influence and effect of each than to arbitrarily hold to the opinion of one without the necessary expert status that such plants could not possibly affect and exclude the plaintiffs, if they were able, from establishing their record in the shape of a full and complete presentation. The following plants are conceded to have been operated by the city in this process of collecting and pumping these waters and with reference to which proof was taken: First, one called "Agawam," located 2 miles east of plaintiffs' farm; second, one called "Merrick," located 2½ miles east of plaintiffs' farm; third, one called "Matowa," located 3½ miles east of plaintiffs' farm; fourth, one called "Wantagh," located 5 miles east of plaintiffs' farm. All of the above were completed in 1896, and each had 50 driven wells. Wantagh infiltration plant, pumping stations, and galleries, the nearest point of which is 3½ miles east of plaintiffs' farm, was completed in 1906, and the Massapequa

infiltration galleries, completed in 1909, are 8 miles east of plaintiffs' farm. In addition thereto, and at a point lying south of plaintiffs' farm, at a distance of about 4,000 feet, the defendant constructed the Milburn pumping station in the year 1891, and in 1905 an infiltration system was added as an additional device to collect the waters. All of these pumping stations, with the exception of the Milburn, which is a sort of equalization plant, comprise a system operating directly upon deep and shallow driven wells. The infiltration system collects waters which would normally waste into the ocean. From a careful reading and analysis of the proof it is clearly demonstrated that the elevations of ground water vary directly with the rainfall; that is, on a yearly comparison, the high and low points would be dependent upon the distribution of the rainfall in that particular year, and that necessarily there must ensue a fluctuation fittingly styled "normal," and not at all to be attributed to mechanical influences. There has thus been established a natural cause, as a factor to be considered in any lowering of the so-called "water table," on plaintiffs' premises.

While the burden is rightfully upon the plaintiffs to prove that the operation of the various stations was to such an extent, either operating singly or simultaneously, as to bring the plaintiffs' land within their influence, to the end of taking from their land or preventing the natural flow to their land of water that was there, or should naturally come thereto, they in my judgment have not sustained same, but, on the contrary, it has been established from the testimony of experienced engineers, and with the tables of their experience in their tests given, that the maximum, as marking the zone of influence of these galleries, was 3,500 feet from the gallery or station (evidence as to Wantagh). A fair and conservative acceptance of the zone of influence would fall far short of this when you therefore contemplate the facts and take into consideration the distances at which the various stations are located from plaintiffs' land (set out above), and then couple with that the additional facts that on the territory from Watts pond to Massapequa, inclusive, there are eight pumping stations, neither owned nor operated by the defendant, and that the nearest driven well station to plaintiffs' farm is owned and operated by the village of Freeport, and that next in proximity to the farm is one operated at Rockville Centre, neither of which is in any way controlled or operated by the defendant, it becomes wellnigh impossible to find in the operation of defendant's stations a cause of any injury to plaintiffs' property. No occasion arises in this opinion for entering into any detailed analysis of this proof. It seems to be unanswerable and conclusive. It strikes me to say in passing that the question of capillary rise of water in Long Island soils and its relation to surface moisture, in the light of Mr. Whipple's testimony in this case, is a very important factor to be considered in this and like cases, and with particular reference to his scientific opinion that a water table situated at five feet from the top soil is of no benefit whatever in the growth of crops.

For the reasons advanced, which in my judgment show that the

operation of these plants complained of could not possibly have been cause of injury to plaintiffs' lands, judgment must be rendered dismissing the complaint.

Complaint dismissed.